UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 10-22862-CIV-KING/BANDSTRA

GROUP USA, INC., a New Jersey corporation,

     Plaintiff,

v.

DOLPHIN MALL ASSOCIATES, LLC, a
Delaware limited liability company, and
THE TAUBMAN COMPANY, LLC, a
Delaware limited liability company,

     Defendants.

_____/

CASE NO. 10-22854-CIV-KING/BANDSTRA

DOLPHIN MALL ASSOCIATES, LLC, a
Delaware limited liability company,

     Plaintiff,

v.

GROUP USA, INC., a New Jersey corporation,

     Defendant.

_____/

**GROUP USA, INC.'S MOTION FOR SUMMARY JUDGMENT
AND SUPPORTING MEMORANDUM OF LAW IN COMPLIANCE
WITH COURT'S ORDERS SETTING BRIEFING SCHEDULE**

     Pursuant to Fed. R. Civ. P. 56 and S.D. Fla. L. R. 7.1 and 7.5, and the Court's Order Setting Briefing Schedule [D.E. 23] and Agreed Order Outlining Court's Rulings at September 21, 2010 Scheduling Conference [D.E. 30], Group USA, Inc. (hereinafter "Group USA") respectfully moves for summary judgment and submits this brief in support thereof.[1]

---

[1]     In support of this Motion, Group USA also relies upon the (1) Statement of Undisputed Facts in Support of Group USA, Inc.'s Motion for Summary Judgment ("SOUF"), (2) the

## INTRODUCTION

Group USA currently operates a clothing store at the Dolphin Mall pursuant to a ten year lease that it entered into in 1997, three years before the mall commenced operation.  Over time, the terms of that lease have become very favorable to Group USA.  The record in this action clearly demonstrates an attempt by Group USA's Landlord[2] at the Dolphin Mall to create a *windfall* for itself out of Group USA's admitted mistake in only giving the Landlord approximately eight months' notice of its intent to renew instead of the required twelve months' notice.[3]

## SUMMARY OF FACTS

The salient facts relating to Group USA's mistake are not in dispute.  In August 2007, Joseph Rapacilo, the person responsible for lease renewals at Group USA, mistakenly entered the wrong lease commencement date in a lease excerpt for Group USA's Dolphin Mall store which he subsequently relied upon when tracking upcoming lease renewals.  Mr. Rapacilo inserted the July 8, 1997 date the Lease was executed rather than the March 1, 2001 date that the Lease commenced.  That mistake caused Group USA to miss the one-year renewal notice deadline (February 28, 2010) for the Dolphin Mall store because Mr. Rapacilo, in reliance upon the erroneous July 8, 1997 commencement date, believed that the 10-year Lease was already in the first of two renewal option periods.

Also not in dispute is that neither Group USA nor the Landlord became aware of Group USA's failure to give the required one year's notice until mid-June 2010, when the Landlord discovered that the February 28, 2010 renewal notice deadline had passed.  Prior to contacting

---

Affidavit of Joseph Rapacilo in Support of Group USA, Inc.'s Motion for Summary Judgment, and Supporting Memorandum of Law in Compliance With Court's Orders Setting Briefing Schedule (3) the deposition transcripts and deposition exhibits attached to the Notice of Filing Deposition Transcripts and Exhibits in Support of Group USA, Inc.'s Motion for Summary Judgment and Supporting Memorandum of Law in Compliance With Court's Order's Setting Briefing Schedule, all of which were filed contemporaneously herewith.

[2]     "Landlord" or the "Dolphin Mall Parties" herein refers, together, to Dolphin Mall Associates, LLC ("DMA") and The Taubman Company, LLC ("Taubman").

[3]     The terms "Lease," "Renewal Option," "Premises" and "Original Term of the Lease" are hereinafter used as defined in the SOUF.  [SOUF at ¶¶ 9-10, 14-15]

2

Group USA in late June 2010, and after consultation with its lawyers "in anticipation of litigation," the Landlord began to aggressively market the Premises, as Group USA's net rental rate (approximately $6 per square foot) was far below the 2010 market rate (approximately $60 per square foot). Group USA, on the other hand, did not discover its mistake until it received the Landlord's June 28, 2010 letter demanding that Group USA vacate the Premises on February 28, 2011. On July 7, 2010, Group USA forwarded its written renewal notice to the Landlord by certified mail as required in the Lease. Representatives of Group USA, including its counsel, also contacted the Landlord by telephone and letters in a vain attempt to persuade the Landlord to allow Group USA to exercise the Renewal Option.

Thereafter, on August 6, 2010, the Landlord stopped marketing the Premises and filed its lawsuit against Group USA requesting a declaratory judgment that Group USA has no right to extend the Original Term of the Lease due to its failure to timely exercise the Renewal Option on or before February 28, 2010. That same day, Group USA also filed a request for a declaration that it be allowed to exercise the Renewal Option.

## SUMMARY OF ARGUMENT

It is a well-established principle in American jurisprudence that there may be special circumstances which warrant granting a tenant equitable relief from the consequences of the tenant's failure to give timely notice of its exercise of a renewal option by the date stipulated in the lease. Indeed, in Florida, as in many other states, courts regularly decide "option" disputes according to principles of equity.[4] Under Florida Supreme Court precedent in *Dugan*, a court in equity may relieve a tenant from the enforcement of a stipulation in the lease that renewal notice must be given within a specified time where the failure to give notice resulted from accident, fraud, surprise or mistake, and there are other special circumstances warranting equitable relief. 54 So.2d at 202. The other special circumstances Florida courts consider are (1) whether the tenant's delay in giving notice of renewal was slight, (2) whether the delay did not prejudice the landlord, and (3) whether the court's failure to grant relief would cause the tenant

---

[4]     *See, e.g., Roschman Partners v. S.K. Partners I, Ltd.*, 627 So.2d 2 (Fla. 4th DCA 1993) (where the optionee stands to lose a great deal if optionor is not forced to perform, equity will compel performance); *Dugan v. Haige*, 54 So. 2d 201 ( Fla. 1951) (equity will relieve against the consequences of a non-prejudicial delay in notice of intent to exercise a renewal option in a lease agreement).

STROOCK & STROOCK & LAVAN LLP • MIAMI • NEW YORK • LOS ANGELES
WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BLVD., SUITE 3100 MIAMI, FL 33131
TEL 305.358.9900 FAX 305.789.9302 WWW.STROOCK.COM

unconscionable hardship.  *See* discussion *infra* Part A.2, p. 7.[5]  This balancing of the equities analysis, which is applicable here, necessarily requires that this Court consider facts as opposed to only legal issues, which renders this case different from a more traditional declaratory judgment action where the parties request that the Court interpret the terms of a lease or some other contract.[6]

A review of the facts in the record here confirms that the equities lie with Group USA, and not with the Landlord.  In this case, the following **undisputed material facts** establish that Group USA is entitled to summary judgment on its equitable relief based on the existence of "special circumstances":

- Group USA admits that it made a mistake but its intention was always to renew.

- Group USA's delay was slight in that its renewal notice was still provided to the Landlord substantially before the end of the lease term (giving Landlord approximately eight months' renewal notice) and immediately upon Group USA learning of its mistake, and in the context of Group USA's long-term Lease providing for a lease duration of up to thirty (30) years.

- The Landlord did not suffer any prejudice based on Group USA's delay because, among other things, the Landlord likely anticipated that Group USA intended to renew the very favorable Lease and the Landlord did not make any commitments whatsoever regarding the Premises occupied by Group USA prior to receiving written notice of Group USA's intention to renew, nor has it since. *This is not a case where a landlord relied in good faith on a tenant's failure to renew believing that it was the tenant's intention not to*

---

[5] The Landlord recognizes the controlling Florida law as established in *Dugan* and its progeny.  [Tr. of Sept. 21, 2010 Scheduling Conference, D.E. 31, at 19:12-15 (Landlord's counsel stated that "[t]here is some authority in Florida that says it would not be an abuse of discretion in certain circumstances to forgive the tenant's failure to give timely notice")]

[6] *See, e.g., Holmes Reg'l Enters., Inc. v. Advanced Med. Diagnostics Corp.*, 582 So.2d 822, 822-23 (Fla. 5th DCA 1991) (the "*extension [granted pursuant to Dugan] was not granted pursuant to the terms of the lease*.  It was a judicial act of equity that saved [tenant] from severe financial loss after [tenant] failed to provide a timely notice required by the terms of the lease agreement") (emphasis added); *see also Perrotti v. Chiodo*, 573 A.2d 342, 343 (Conn. App. Ct. 1990) ("Whether an option in a lease to renew has been exercised is a question of fact for the trial court, which looks to the intent of the parties as expressed in their words and deeds.") (citation omitted).

4

*renew*, and *acted accordingly by executing a new lease with a third party that committed the landlord to make the Premises available to the new tenant upon expiration of the current tenant's lease.*[7]  Such a case for real prejudice to a landlord from a tenant's failure to renew cannot be made here based on the undisputed facts.  In this case, Landlord's only basis for arguing that it was prejudiced is that it can receive higher rental income from a new tenant under current market rates.  In other words, *Landlord's only claimed prejudice is derived from having to live with the agreement that was struck in the Lease*.  This cannot be the kind of consequence that Florida law protects landlords from because, if that were true, then every landlord who tried to evict a tenant who missed a renewal deadline based on excusable fault would be successful because common sense tells us that landlords do not sue to evict tenants that are paying at or above market rates.

- Finally, *Group USA is likely to suffer the most significant, most draconian, most unconscionable hardship imaginable – i.e., potential insolvency and the loss of its entire business* – if the Lease is not renewed.

---

[7]  For an example of a case involving real prejudice to a landlord than can easily be distinguished from this case, *see Optivision, Inc. v Syracuse Shopping Center Associates*, 472 F.Supp. 665, 683-84 (N.D.N.Y. 1979) (applying New York law) ("[I]t is particularly significant that the landlord did not receive notice of Optivision's decision to renew its lease until after the signing of the lease between the landlord and DeWitt on September 6, 1978 which was also after the August 31, 1978 contractual [renewal] deadline. *The Court finds that the landlord entered into the arrangement with DeWitt in the good faith belief that Optivision had not exercised its [renewal] option.* While the negotiations with Mr. DeWitt, for the rental space in Northern Lights, began before August 31, 1978, the terms of the lease, including the exclusivity clause, were not agreed upon until after that date.  *It appears that the landlord would be liable in damages to DeWitt for breach of the exclusivity clause if Optivision is allowed to remain in Northern Lights.  Hence, the landlord changed its position before learning of Optivision's decision on renewal.  Because of the prejudice, which the landlord would suffer by giving effect to Optivision's late renewal, this case is distinguishable from the previously cited cases in which the New York courts granted equitable relief to tenants who exercised options to renew in an untimely manner.*") (emphasis added).

5

STROOCK & STROOCK & LAVAN LLP • MIAMI • NEW YORK • LOS ANGELES
WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BLVD., SUITE 3100 MIAMI, FL 33131
TEL 305.358.9900 FAX 305.789.9302 WWW.STROOCK.COM

Accordingly, Group USA is entitled to summary judgment[8] on its declaratory judgment claim requesting equitable recognition of Group USA's exercise of the Renewal Option on July 7, 2010.

## MEMORANDUM OF LAW

**A.    Controlling Florida Law Dictates Equitable Recognition Of A Tenant's Untimely Exercise Of A Renewal Option Under Certain Circumstances.**

>    1.    *The Fundamental Rule Of Equity Announced By The Florida Supreme Court In Dugan v. Haige*

For almost sixty years there has been a line of cases in Florida that addresses equitable recognition, and excusal, of tenants' untimely exercise of options to renew or extend at the end of the lease term.   The seminal case is *Dugan v. Haige*, 54 So.2d 201 (Fla. 1951).   There, the Florida Supreme Court addressed a case in which the plaintiffs were lessees under a 10-year lease that granted the plaintiffs an option to renew at the end of the term upon 30 days' notice. The plaintiffs admittedly gave their renewal notice 12 days (not 30 days) prior to the end of the lease term, and the lessors seized upon this delay to refuse to renew.   Plaintiffs sued in equity for a declaration of the parties' rights under the lease, and the Chancellor, "who heard the testimony, found as a matter of fact that the lessors had actual notice of the lessees' intention to extend the

---

[8]    Summary judgment should be granted if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).   The movant bears the initial responsibility of asserting the basis for his motion.   *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986); *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir. 1990).   After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence designating "specific facts showing that there is a genuine issue for trial" that precludes summary judgment.   *Celotex*, 477 U.S. at 324.   While the Court is to review the evidence produced and all factual inferences arising from it in the light most favorable to the nonmoving parties, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Barfield v. Brierton*, 883 F.2d 923, 934 (11th Cir. 1989); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).   On the issue of materiality, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248.   Material facts are those over which disputes "might affect the outcome of the suit under the governing law." *Id.* at 248. If the nonmoving party's "response consists of nothing more than a repetition of his conclusory allegations, the district court must enter summary judgment in the moving party's favor. *Barfield*, 883 F.2d at 934.

lease; that the lessors had not been harmed or damaged by the lessees' delay in giving the written notice; and that the equities were with the lessees." *Dugan*, 54 So.2d at 202. The Chancellor "thereupon decreed that the lease be deemed extended for the additional five-year period contemplated by the lease." *Id*. The lessors appealed and the question presented on appeal was "whether the lower court abused its discretion in relieving the lessees . . . from the consequences of their failure to comply strictly with the [lease] provisions relating to the renewal thereof." *Id*. On appeal, the Florida Supreme Court affirmed under the rule that:

> [E]quity will relieve against the consequences of a failure to give notice which is a condition precedent to the renewal of a lease when such failure results from accident, fraud, surprise, or *mistake*, and there are other special circumstances which may warrant a court of equity in granting relief against the consequences of the lessee's failure to notify the lessor, within the stipulated time, of an intention to exercise the privilege of renewal.

*Id*. (emphasis added) (quoting 32 AM. JUR. *Landlord and Tenant* § 981, p. 824).

   2.   *The Three-Part Test For Equitable Intervention*

In addition to the fundamental rule of equity announced in *Dugan*, it is a general rule in Florida, as it is in other states, that the courts will consider the following "special circumstances" in determining whether equity will intervene: (1) whether the tenant's delay in giving notice of renewal was slight, (2) whether the delay did not prejudice the landlord, and (3) whether failure to grant relief would cause the tenant unconscionable hardship. *Inv. Builders of Fla., Inc. v. S.U.S. Food Mkt. Invs., Inc.*, 753 So.2d 759, 760 (Fla. 4th DCA 2000) (citation omitted). As fully detailed below, under the "special circumstances" presented here, equitable recognition of Group USA's untimely renewal notice comports with *Dugan* and the three-part test.

   3.   *Dugan And Its Progeny Are Followed In Florida And The Majority Of Other States And Are Applicable Here*

The fundamental rule of equity and the three-part equitable intervention test that *Dugan* and its progeny pronounced have consistently been followed by Florida courts and by federal courts citing Florida law:

In *Holmes Reg'l Enters., Inc. v. Advanced Med. Diagnostics Corp.*, 582 So.2d 822, 822 (Fla. 5th DCA 1991), for example, the appellate court applied the tests prescribed by *Dugan* and its progeny and affirmed the trial court's final judgment granting equitable relief to the commercial tenant from the landlord's refusal to renew the lease. The trial court had allowed the

7

tenant to remain in possession of the premises even though the tenant had given "tardy notice of its exercise of an option to renew under a written lease agreement." *Id.* In that case, the tenant's notice was six weeks late, and the appellate court described the trial court's decision as "a judicial act of equity that saved [the tenant] from severe financial loss after [the tenant] failed to provide a timely notice required by the terms of the lease agreement." *Id.* at 823.

In *Ledford v. Skinner*, 328 So.2d 219 (Fla. 1st DCA 1976), the parties entered into a lease of a car wash business with lessees having an option to purchase the business at the end of the term.   When the lessees sought to exercise the purchase option almost seven weeks late, however, the owner refused to sell alleging that the exercise was not timely.   The trial court entered a decree requiring lessors to sell the property to lessees pursuant to the option to purchase and lessors appealed.   The appellate court affirmed the trial court, finding that there was an equitable basis, which brought the case within the rule of *Dugan*, for permitting the lessees to exercise option to purchase even though lessees did not give timely notice of their desire to renew the lease and never even gave the written notice which was required by lease. *Ledford*, 328 So.2d at 220.

Similarly, in *Inv. Builders of Fla., Inc. v. S.US. Food Mkt. Invs., Inc.*, 753 So.2d 759 (Fla. 4th DCA 2000), the trial court, based upon *Dugan* and its progeny, had entered a declaratory judgment granting the tenant relief from its failure to timely renew the lease.   The appellate court affirmed the trial court, holding that "[b]ecause the president of the corporate tenant was sick, the corporation failed to send in a notice of renewal of the lease until the landlord notified him of his failure eight days after the renewal deadline had passed, at which time the tenant immediately sent him notice that he wished to renew." *Id.* at 759.   In reaching its determination that equity relieved the corporation from the consequences of its sick president's failure to timely renew the lease,   the appellate court "conclud[ed] that a mistake from which equity will relieve a tenant can include some degree of negligence, so long as the mistake is not the result of an inexcusable lack of due care." *Id.* at 760 (citing *Maryland Cas. Co. v. Krasnek*, 174 So.2d 541, 543 (Fla. 1965) (discussing "mistake" in the context of contract rescission); *U.S. Alliance Corp. v. Tobon*, 715 So.2d 1122, 1124 (Fla. 3d DCA 1998)).

***In all of the foregoing Florida cases, like here, the tenants gave delayed notices of their intent to exercise their renewal options which did not strictly comply with the literal terms of their leases.***   Those decisions, therefore, are directly analogous and should be applied to the issue

STROOCK & STROOCK & LAVAN LLP • MIAMI • NEW YORK • LOS ANGELES
WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BLVD., SUITE 3100 MIAMI, FL 33131
TEL 305.358.9900 FAX 305.789.9302 WWW.STROOCK.COM

presented in this case.  To the extent that the Landlord intends to suggest that the foregoing cases involved judicial protection of unsophisticated tenants victimized by landlords with disparate bargaining power, Landlord would be wrong.  *Like the case presented here, those cases were between sophisticated parties engaged in commercial transactions.*  *Holmes Reg'l Enters., Inc.*, 582 So.2d at 822 (medical diagnostic company contracting with corporate enterprise); *Ledford*, 328 So.2d at 220 (car wash property owners contracting with car wash business owners); *Inv. Builders of Fla., Inc.*, 753 So.2d at 759 (corporate supermarket contracting with corporate landlord).  *Moreover, all of those cases, like this one, were actions brought by tenants seeking equitable relief.*  *Dugan*, 54 So.2d at 202 (tenant sought an equitable decree in its favor); *Holmes Reg'l Enters., Inc.*, 582 So.2d at 823 (tenant sought declaratory and injunctive relief); *Ledford*, 328 So.2d at 220 (tenant sought an equitable decree in its favor); *Inv. Builders of Fla., Inc.*, 753 So.2d at 759 (tenant filed action for a declaratory judgment).

Moreover, the standard for equitable intervention set forth in Dugan and its progeny is firmly established in American jurisprudence.  A review of the majority of state high courts regarding their body of law on point confirms that there is not only a broad consensus that equity can intervene in such cases but also with respect to the three-part test that courts should apply when weighing the equities on such a claim for equitable relief.  *See, e.g.,* 49 AM. JUR. 2D *Landlord and Tenant* § 178 (1995); William D. Farber, Annotation, *Lessee's Excusable Failure to Give Timely Notice Exercising Option to Renew*, 50 AM. JUR. PROOF OF FACTS 2d 519 § 2 (1988); William B. Johnson, Annotation, *Circumstances Excusing Lessee's Failure To Give Timely Notice Of Option To Renew Or Extend Lease*, 27 A.L.R.4th 266 § 3 (1984).  An Ohio appellate court has explained one reason behind this rule of equity, which disregards what is provided in the literal terms of the lease, as follows:

> Since an option to renew a lease is plainly of great value to commercial tenants, especially in an age of inflation, and is given in exchange for valuable consideration, such a valuable benefit should be protected by equity against a forfeiture where the lessee has faithfully met the rents and all other substantial requirements of the lease through the entire term.[9]

*Ward v. Washington Distribs., Inc.* 425 N.E.2d 420, 423 (Ohio Ct. App. 1980) (citation omitted).

    4.    *Dugan And Its Progeny Are In Accord With Florida Jurisprudence*

---

[9]    Here, Group USA has paid and continues to pay all rental payments and other charges payable by Group USA under the terms of the Lease.  [SOUF at ¶ 13]

The *Dugan* line of cases, and Group USA's position in this brief, is also in accord with Florida jurisprudence.  As the Eleventh Circuit stated in *Burger King Corp. v. Mason*, 710 F.2d 1480, 1490 (11th Cir. 1983): "[T]he Florida courts, and this court construing Florida law, have held that a party may not escape performance under a contract on the ground that a tender was not made by the date specified in the contract.  Rather, a party who tenders late may enforce the contract with due allowance for any damage caused by the tardiness." (citing Florida cases).[10]

The cases following *Dugan*, and Group USA's position herein, is also in accord with Florida law disfavoring, indeed abhorring, forfeitures.  *In re Belize Airways Ltd.*, 5 B.R. 152, 154 (Bankr. S.D. Fla. 1980) ("The law of Florida, like many other states, disfavors forfeiture clauses in leases.").  In *Belize Airways,* the court expressly held that a clause in a lease that provides for termination of a right upon any default, however minor, is a forfeiture provision "since they provide for the termination of a valuable property interest upon any default, however minor, without the opportunity to cure the default." *Id*.  In that case, the court noted that "the ***provisions were invoked to terminate a leasehold interest worth substantially more than the amount of the rental payments***." *Id*. (emphasis added).  There is no question that Florida courts disfavor and generally reject such forfeitures.  In *Smith v. Winn Dixie Stores, Inc.,* 448 So.2d 62 (Fla. App. 1984), a corporate lessee sought relief from the court after the lessor evicted it for failure to comply with a rental lease obligation.  The Court of Appeal held that the tenant was entitled to relief from forfeiture of its lease in light of its long-standing compliance with the lease, and given the relatively minor nature of its breach and its prompt willingness to cure the default.  The court stated: "***Courts of equity always mitigate forfeitures when it can be done without doing violence to the contract of the parties***...." *Smith*, 448 So.2d at 64 n.6 (emphasis added); *see also Roschman Partners v. S.K. Partners I,* 627 So.2d 2, 5 (Fla. App. 1993) ("***Our supreme court has held that where the optionor stands to receive a windfall if not compelled to perform, and the optionee stands to lose a great deal, equity is served by compelling performance under the***

---

[10]    In this case, forfeiture of the Renewal Option provided for in the parties' Lease based on Group USA's late notice (where Landlord received approximately ***eight (8) months' notice*** of Group USA's intention to renew) is not a just result under Florida equity law.  Group USA contends that, despite the late notice, Group USA was ready, willing and able to renew its Lease for the ten-year renewal period beginning March 1, 2011 in accordance with the terms of the Lease, and the doctrine of substantial performance should be invoked to force the Landlord to honor Group USA's exercise of the Renewal Option.  *See Burger King*, 710 F.2d at 1490.

STROOCK & STROOCK & LAVAN LLP • MIAMI • NEW YORK • LOS ANGELES
WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BLVD., SUITE 3100 MIAMI, FL 33131
TEL 305.358.9900 FAX 305.789.9302 WWW.STROOCK.COM

*contract*.") (citing *Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp.*, 302 So.2d 404, 410 (Fla. 1974)) (emphasis added).

In sum, irrespective of the lens used to examine this case, the caselaw in Florida overwhelmingly requires equitable recognition of Group USA's exercise of the Renewal Option. Florida law simply does not and should not permit a party to a contract to lose millions of dollars of lease value that it has worked to create for almost ten years simply because of a *technical*, *harmless* delay in sending out its renewal notice.

**B.      Group USA Satisfies The Controlling Tests In Florida For Equitable Recognition Of Its Untimely Exercise Of The Renewal Option.**

Here, the evidence shows not only that Group USA's failure to timely renew resulted from a "mistake" as required in *Dugan*, but also that the three-prong test for equitable intervention has been satisfied.

1.      *The Undisputed Facts Establish That Group USA's Delay In Exercising The Renewal Option Resulted From A Mistake And Was Slight In The Context Of The 10-Year Lease Of Up To 30 Years Duration.*

There is ample evidence in the record that Group USA's delay in exercising its Renewal Option resulted from an honest mistake as opposed to gross or willful negligence.  *See, e.g., Ward v. Washington Distribs., Inc.*, 425 N.E.2d 420, 423 (Ohio Ct. App. 1980) ("Equity will not tolerate a forfeiture where the lessees' delay was attributable to an erroneous recollection of the number of days in advance that the notice to renew was required to be presented, or to an honest mistake, where there was no willful or deliberate act or omission of the lessees...."). Group USA has sufficiently pled and proven a mistake as required by *Dugan*.  [Complaint at ¶ 23; SOUF at ¶¶ 21-31]

Specifically, the evidence shows that Group USA intended to renew the Lease but missed the February 28, 2010 renewal notice deadline.  The mistake occurred back in August 2007 when Group USA's Vice President of Finance, Joseph Rapacilo, who is the person responsible for lease renewals at Group USA, mistakenly inserted the wrong lease commencement date (he inserted the July 8, 1997 date the lease was executed rather than the March 1, 2001 that the lease commenced) on the lease excerpt prepared for the Dolphin Mall store.  [SOUF at ¶ 26]  Mr. Rapacilo later relied upon this mistake when tracking upcoming renewals.  [*Id*. at ¶ 27]  Mr. Rapacilo testified that he tracks renewals by reviewing the lease excerpts for each of Group

11

USA's stores in conjunction with preparing Group USA's financial projections for the next fiscal year.   [*Id.*]   When he reviewed the lease excerpts at the end of 2009, he looked at the commencement date indicated in the lease excerpt (July 8, 1997 – the incorrect date due to the mistake) for the Dolphin Mall store and believed that this Lease was already on its first Renewal Option period. [*Id.* at ¶ 29]  This is how the mistake in the lease excerpt caused Group USA to miss the one-year renewal notice deadline (February 28, 2010) for the Dolphin Mall store. [*Id.*] *See Ward*, 425 N.E.2d at 422 (lease digest summarizing lease information reflected wrong lease expiration date which caused tenant to believe that the notice to renew was not due until later).

The Landlord does not have any evidence to contradict the foregoing evidence in the record of the "mistake" which prevented or hindered Group USA's timely exercise of the Renewal Option.  Landlord's representative has testified that they don't know why Group USA "missed" the deadline. [*Id.* at ¶ 31]  Notably, however, the Landlord certainly acted as if it knew that Group USA intended to renew the Lease.  For example, the Landlord was consulting with its attorneys in "anticipation of litigation" as early as June 17, 2010 (and possibly earlier) – eleven days before the Landlord first reached out to Group USA (on June 28, 2010) to advise that Group USA had missed the renewal notice deadline[11] and that Group USA must vacate the Premises on February 28, 2011. [*Id.* at ¶¶ 33, 39-40]

Finally, it is worth noting that the terms of the Lease support Group USA's position that it always intended to renew the Lease, and that the Landlord knew all along that it was Group USA's intention to renew.  The Lease is an extremely favorable lease for Group USA, and an economically disadvantageous one for the Landlord.  Group USA's current rental rate under the Lease is fifteen dollars ($15.00) per square foot, and its rental rate during the Renewal Option period will be seventeen dollars ($17.00) per square foot for the first five years and eighteen dollars ($18.00) per square foot for the next five years. [SOUF at ¶ 17]  On top of that, Group USA is entitled to a rent credit which one of the Landlord's representatives has referred to as "unique."   [*Id.* at ¶ 18]    Thus, Group USA's current *net* rental rate under the Lease (approximately $6 per square foot) is considerably below the market rate (approximately $60 per square foot). [*Id.* at ¶¶ 19, 20]  In light of these incredibly favorable terms in the Lease, would

---

[11]    During this eleven-day period (and possibly a longer period if the Landlord learned of Group USA's mistake prior to June 17, 2010), the Landlord acted in bad faith and contributed to Group USA's delay in providing notice of renewal.

Group USA intentionally forfeit this lease?  Clearly, the answer is no, and the Landlord clearly knew that.

Group USA has also shown that the three-prong test set forth in *Inv. Builders of Fla., Inc.* has been satisfied.  The first prong of the test is satisfied if the record reflects that Group USA's delay in giving notice was slight.

There is analogous case law on point which establishes that Group USA's four-month delay was slight in light of the long-term Lease.  In *Aickin v. Ocean View Invs. Co., Inc.*, 935 P.2d 992, 1000 (Haw. 1997), the Supreme Court of Hawaii, applying the same three-part test recognized in Florida, found that a delay of more than four months in the context of a ten-year lease was not "unreasonably long" and thus should be considered "slight," stating: "We do not believe a four-month delay, within the context of a ten-year lease of potentially fifty years' total duration, was unreasonably long."  The *Aickin* court also noted that the tenants' ten year lease term had not yet expired when they gave notice of their intent to renew, that the landlord did not dispute receiving this notice and there was no evidence showing that tenants' actions were intentional, willful, or even grossly negligent, but rather tenants' delay was due to an oversight. *Id.*

Applying the *Aickin* court's reasoning here, Group USA's four-month delay was slight given that:

- The original Lease term had not expired (it expires on February 28, 2011) when Group USA gave its renewal notice (on July 7, 2010) [SOUF at ¶¶ 14, 43];

- The potential duration of the Lease is 30 years based on the two renewal options in Section 4.2 of the Lease [SOUF at ¶ 15];

- The Landlord does not dispute receiving Group USA's July 7, 2010 renewal notice [SOUF at ¶ 44];

- The Landlord actually received approximately eight months' notice of Group USA's renewal, which is more notice than this Landlord receives from more than half of the other tenants at the Dolphin Mall that have lease renewal options [SOUF at ¶ 54 (showing that more than half of the Landlord's Dolphin Mall leases that contain renewal option notice periods require eight (8) months' or less renewal notice; approximately sixteen (16) out of twenty-eight (28) such leases contain renewal option notice periods of 8 months or less)]; and

13

STROOCK & STROOCK & LAVAN LLP • MIAMI • NEW YORK • LOS ANGELES
WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BLVD., SUITE 3100 MIAMI, FL 33131
TEL 305.358.9900 FAX 305.789.9302 WWW.STROOCK.COM

- Group USA's delay would have been even shorter if the Landlord, who learned of Group USA's mistake in mid-June, had immediately notified Group USA that it missed the deadline instead of waiting until June 28, 2010 to do so [SOUF at ¶¶ 32, 39-40].

2. *The Undisputed Facts Establish That The Landlord Was Not Prejudiced By Group USA's Delay In Exercising the Renewal Option.*

The second prong of the controlling test is satisfied if the record reflects that Group USA's delay did not prejudice the Landlord.

In its interrogatory responses, the Landlord has identified the "prejudice" it claims to have suffered as a result of Group USA's actions:

> DMA has been prejudiced because it has not been in a position to pursue to fruition discussions with potential tenants for the space currently occupied by Group USA as a result of Group USA's refusal to recognize its lease expiration date and its subsequent lawsuit, which have prevented DMA from being in a position to commit to providing the space on March 1, 2011…. Any tenant that signs a 10 year or longer lease for the space currently occupied [by Group USA] will pay millions of dollars more in lease payments at prevailing market prices. Additionally, potential tenants interested in the space currently occupied by Group USA are expected to generate more business for Dolphin Mall and increase revenues for all tenants and for DMA. To the extent that the space currently occupied by Group USA is left vacant for a period of time subsequent to lease expiration on February 28, 2011 before a new tenant can move in and begin operations, additional revenues will be lost, to the prejudice of DMA.

[Dolphin Mall Associates, LLC's Responses to Group USA, Inc.'s First Set of Interrogatories ("DMA's Interrogatory Responses"), Ex. 15 to Weinert Dep., at p. 17; *see also* deposition testimony cited in SOUF at ¶¶ 19-20, 36]

None of the Landlord's claimed "prejudice" justifies forfeiture of Group USA's Lease under Florida law. ***Florida courts require that the prejudice to the landlord must arise from the delay itself.*** *Inv. Builders of Fla., Inc.,* 753 So.2d at 760 (second prong is that "*the delay* did not prejudice the landlord") (emphasis added).

Here, it is clear from the record that Group USA's delay, by itself, did not cause any prejudice to the Landlord. Neither Group USA nor the Landlord became aware of Group USA's mistake until mid-June 2010. [SOUF at ¶¶ 32-40] The Landlord discovered the mistake first in mid-June 2010 and immediately consulted with its lawyers "in anticipation of litigation." [*Id.* at ¶ 33] Group USA did not discover its mistake until it received the June 28, 2010 letter

14

demanding that Group USA vacate the Premises on February 28, 2011 based on Group USA's failure to exercise the Renewal Option by February 28, 2010. [*Id.* at ¶¶ 39, 40]  Immediately upon receipt of the Landlord's June 28, 2010 letter, Group USA's Vice President of Finance called and wrote to the Landlord's Lease Administrator on July 6, 2010 to discuss renewal and, on July 7, 2010, Group USA delivered its written renewal notice to the Landlord by certified mail as required in the Lease. [*Id.* at ¶¶ 41-43]  Under these facts, only approximately *20 days* (from mid-June through July 7, 2010) elapsed between the time that the Landlord discovered that Group USA missed the renewal deadline and the time that Landlord received Group USA's renewal notice.

The record further reflects that the Landlord did not suffer any prejudice during this brief 20-day period:

- During this time, Landlord admitted that it was consulting with its attorneys in "anticipation of litigation" with Group USA (which shows that Landlord knew that it was Group USA's intention to renew the Lease even before Group USA sent in its renewal notice)[12] [SOUF at ¶ 33];

- There is no evidence in the record that Group USA ever affirmatively indicated to the Landlord that it would not renew its Lease [SOUF at ¶¶ 41, 42]; and

- The Landlord did not rely to its detriment on Group USA's failure to timely renew because it concedes that it did not execute a new lease during this period, nor did it provide a letter of intent to a prospective tenant, or otherwise do anything to *secure* another tenant during the 20-day period before it received Group USA's renewal notice [SOUF at ¶¶ 37, 53].

The fact, therefore, that there is an alleged disparity between the rental rate the parties to the Lease negotiated 10 years ago[13] and the current market rental rate[14] does not establish

---

[12]    Had the Landlord acted with good faith and integrity by simply calling Group USA sometime before the renewal notice deadline of February 28, 2010 to confirm what they already knew – that Group USA intended to renew – the parties would not be here today.

[13]    The Landlord concedes that it has assumed all rights and obligations of the "Landlord" under the Lease and is therefore bound by all terms and conditions of the Lease. [SOUF at ¶ 9]

[14]    Notably, the Landlord will be entitled to an approximately 3% rent increase (from $15 per square foot to $18 per square foot) from Group USA during the 10-year renewal period

prejudice to the Landlord because the disparity was not caused by Group USA's delay in providing its renewal notice. *See, e.g.,* William D. Farber, 50 AM. JUR. PROOF OF FACTS 2D 519 § 9 (1988) ("[T]he prejudice or hardship to the lessor cannot be mere general hardship; it must directly relate to the lessee's default."); *In re Royal Yarn Dyeing Corp.,* 114 B.R. 852, 863 (Bankr. E.D. N.Y. 1990) ("The instant lease, as extended, would run into 1997 at the rate of approximately $1.00 per square foot. The evidence indicates that the market rate in 1987 was $4.00-4.50 per square foot. Therefore, the lease is clearly a valuable asset.... The landlord has suffered no prejudice as a result of the late exercise of the option. ***There is no evidence that the landlord has changed its position because of the Debtor's failure to timely exercise the option and the fact that the landlord would be able to realize a higher rate in re-renting the premises does not amount to prejudice.***") (emphasis added); *Gold Standard Enterprises, Inc. v. United Investors Mgmt. Co.,* 182 Ill. App. 3d 840, 846, 538 N.E.2d 636, 640 (1989) (noting that "[t]rue, the record shows that the rental value of the leased premises has appreciated in today's market. Defendant could charge a higher rent under a new lease.  However, ***the record contains no evidence that the actual delay in receiving the notice, by itself, harmed defendant***") (emphasis added); *Nanuet Nat'l Bank v. Saramo Holding Co.,* 545 N.Y.S.2d 734, 736 (N.Y. App. Div. 1989) ("[W]e agree with the Supreme Court's conclusion that the ***defendant did not establish that it would suffer prejudice by the renewal of the lease, other than the possible loss of a financial windfall***.  Significantly, the defendant obtained the assignment of the lease with full knowledge of the plaintiff's options to renew the lease for three additional 10-year terms....  in the absence of any indication that the defendant was relying on the nonrenewal of the plaintiff's lease, it should not be permitted to exact a substantial forfeiture based on plaintiff's brief delay in complying with the notice requirement.") (emphasis added).

Furthermore, even if Landlord's allegations regarding the disparity in the rental rate could establish prejudice, which they can't, the Landlord admits that it never got as far as negotiating a new lease with prospective tenants at market rates.  Consequently, there are no facts in the record to support the Landlord's allegations of prejudice.

Since Landlord cannot establish, as a matter of law, that it has been prejudiced by Group USA's delay, Group USA is entitled to the equitable relief it seeks.  Under the "special

---

according to Section 5.3 of the Lease if Group USA's exercise of the Renewal Option is recognized by this Court. [SOUF at ¶ 17]

STROOCK & STROOCK & LAVAN LLP • MIAMI • NEW YORK • LOS ANGELES
WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BLVD., SUITE 3100 MIAMI, FL 33131
TEL 305.358.9900 FAX 305.789.9302 WWW.STROOCK.COM

circumstances" presented here, the Court's equitable recognition of Group USA's delayed renewal notice would not cause any prejudice to the Landlord. If the Lease is deemed renewed, the Landlord will not suffer a vacancy[15] and will receive from Group USA the rental payments and other charges that are due the Lease.[16] Alternatively, the net effect, if this Court were to refuse to recognize Group USA's renewal notice, would be an ***unwarranted potential windfall*** to the Landlord that is not supported by any evidence in the record.

     3.     *The Undisputed Facts Establish That Group USA Will Suffer Unconscionable Hardship If Group USA Is Not Permitted To Renew and Extend the Lease.*

The third and final prong of the controlling test is satisfied if the record reflects that failure to grant equitable relief would cause Group USA unconscionable hardship. This factor also supports equitable intervention in this case. The evidence shows that Group USA would suffer unconscionable financial hardship, namely a large financial forfeiture that would result, in all likelihood, in Group USA becoming insolvent [SOUF at ¶¶ 48-52], if this Court does not recognize Group USA's delayed exercise of the Renewal Option.

As previously mentioned, due to increases in property values in South Florida,[17] Group USA leases the Premises at the Dolphin Mall for considerably below market rental value. [SOUF at ¶¶ 17, 19-20, 36; *infra* Part B.1., p. 12] ***Therefore, by the Landlord's own admission, Group USA would have to pay millions of more dollars in rental payments for a ten-year lease at an alternative location in this area based on prevailing market rental rates.*** [DMA's Interrogatory Responses, Ex. 15 to Weinert Dep., at 17; *see also* SOUF at ¶¶ 17, 19-20, 36]

---

[15]     [SOUF at ¶ 16 ("The general purpose of a renewal option clause in a lease is to protect the landlord from being prejudiced from the tenant's termination and provide the landlord ample time to locate a new tenant caused by the resulting vacancy.")]

[16]     The Landlord argues for the sanctity of contracts and the need for judicial respect of the literal meaning of their bargained-for terms, yet it clearly wants to avoid the rental rate for the renewal period as expressed in the original contract between the parties.

[17]     The Lease has essentially grown in value during the term of the Lease. Given that Group USA was one of the first "major" stores at the Dolphin Mall when the mall first opened ten years ago [SOUF at ¶ 11], and to the extent that Group USA contributed to the mall's success during the term of its Lease, the Landlord has no right in equity or law to seize that value from Group USA because of a harmless delay in renewal notice. *See Roschman Partners,* 627 So.2d at 5.

STROOCK & STROOCK & LAVAN LLP • MIAMI • NEW YORK • LOS ANGELES
WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BLVD., SUITE 3100 MIAMI, FL 33131
TEL 305.358.9900 FAX 305.789.9302 WWW.STROOCK.COM

Joseph Rapacilo, who is Group USA's Vice President of Finance, and who is responsible for the company's financial statements, review of the corporate tax returns, cash management, oversight of accounts payable and payroll, in addition to lease administration [SOUF at ¶ 2], and who is familiar with the operation of all stores within the Group USA portfolio of stores [*Id.* at ¶¶ 2, 27], has also testified that:

- Group USA's store at the Dolphin Mall is one of the three most profitable stores in the Group USA portfolio that includes approximately 25 stores located in malls across the United States and in Puerto Rico.  [SOUF at ¶ 48]

- The Dolphin Mall Group USA store is the only Group USA store located in Miami, Florida.  If Group USA is not allowed to renew its Lease, it will lose the reputation, goodwill, long-time customers and employees associated with Group USA's store at the Dolphin Mall.[18]  However, the economic damage Group USA would suffer goes far beyond these items.  [SOUF at ¶ 49]

- A profit and loss spreadsheet ("P & L spreadsheet") prepared by Mr. Rapacilo, and upon which he was deposed on November 2, 2010, reflects that, for the year ended January 2010 (for the twelve month period February 2009 to January 2010), the Dolphin Mall store contributed $921,413 to Group USA's total net income of $627,239.  Group USA would have incurred a net loss of $294,174 if it were not for the contribution of the Group USA Dolphin Mall store.  [SOUF at ¶ 50]

- The P & L spreadsheet further demonstrates that Group USA's company-wide operations will be devastated if the Dolphin Mall store is not allowed to renew its

---

[18]    *See, e.g., Popyork, LLC v. 80 Court St. Corp.*, 806 N.Y.S.2d 606, 608 (N.Y. App. Div. 2005) ("We also note that if the lease is not renewed, the plaintiff will lose the goodwill it shares with the community and its customer base."); *Nanuet National Bank v. Saramo Holding Co.*, 545 N.Y.S.2d 734, 736 (N.Y. App. Div. 1989) ("[O]ver the 20 years that the plaintiff had been located at the demised premises, it had developed a clientele of approximately 1,500 customers. Notably, the plaintiff did not maintain another branch office within the Town of Ramapo.  In view of . . . the goodwill which the plaintiff has acquired at that location, it is clear that a substantial forfeiture would result to the plaintiff if the renewal is not permitted.").

STROOCK & STROOCK & LAVAN LLP • MIAMI • NEW YORK • LOS ANGELES
WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BLVD., SUITE 3100 MIAMI, FL 33131
TEL 305.358.9900 FAX 305.789.9302 WWW.STROOCK.COM

Lease.  In fact, should Group USA be forced to close its store in the Dolphin Mall, Mr. Rapacilo believes that during the first year that Group USA operates without the Dolphin Mall store's approximate $900,000 cash contribution, Group USA's projected net income of approximately $600,000 will turn into a loss exceeding $300,000 for the fiscal year.  In addition, Group USA's cash position will evaporate, it will be unable to meet its financial obligations to its employees, vendors, and landlords, and it will be forced to purchase merchandise from vendors on a "Cash-in-Advance" basis only.  By end of the second year, without the approximate $1,800,000 generated from the Dolphin Mall store's cash contribution, sales will have plummeted due to the lack of merchandise, Group USA will be forced to close other stores and incur legal expenses due to those store closures, and the company will likely be insolvent.  [SOUF at ¶ 51]

In the context of a slight delay in notice by a long-term tenant that did not cause the Landlord any prejudice, the foregoing undisputed evidence establishes that if Group USA is not allowed to renew the Lease it will, at a minimum, lose the substantial contribution of income from the Dolphin Mall store supporting Group USA's overall profitability, in addition to the reputation, goodwill, customer base and employees cultivated over the ten years that Group USA has operated its store at the Dolphin Mall.[19]  As a result, according to its Vice President of Finance, within two years from losing the Dolphin Mall store, Group USA would likely be insolvent.  [SOUF at ¶ 52]  Florida courts have recognized that saving a tenant from financial loss, especially this kind of devastating loss, is sufficient to satisfy the unconscionable hardship prong.  *See, e.g., Holmes Reg'l Enters., Inc.,* 582 So.2d at 822-23 (saving tenant from "severe financial loss").  Accordingly, the undisputed ***potential insolvency and loss of its entire business*** that Group USA would face is more than sufficient to satisfy the third prong of the test for equitable intervention, and this Court's decision to intervene in equity to save Group USA from this "severe financial loss" would be factually supported and fully appropriate.

---

[19]     If Group USA ever finds a suitable alternative site, Group USA will also incur higher rental obligations at that alternative location.  *See* discussion *supra* Part B.3, p. 17.

19

Case No. 10-22862-CIV-KING
Case No. 10-22854-CIV-KING

## CONCLUSION

Based on the foregoing, there can be no genuine dispute that Group USA has satisfied *Dugan* and the three-prong test for equitable recognition of untimely lease renewal notices under Florida law, and, pursuant to that authority, Group USA's delayed exercise of its Renewal Option should be recognized and enforced.

Accordingly, Group USA respectfully requests that the Court enter summary judgment on the declaratory judgment claim[20] set forth in Count I of Group USA's Complaint,[21] and enter a declaratory decree ordering that the Lease is deemed renewed and the Landlord must honor Group USA's exercise, via Group USA's written notice to DMA dated July 7, 2010, of Group USA's option to renew and extend the Lease for an additional (10) years as provided in Section 4.2 of the Lease, and that Group USA is entitled to all rights vested in it as the Tenant upon renewal of the Lease.

Dated: November 29, 2010

Respectfully submitted,

STROOCK & STROOCK & LAVAN LLP

*Attorneys for Group USA, Inc.*
200 South Biscayne Boulevard
Suite 3100 - Wachovia Financial Center
Miami, Florida 33131
Telephone: (305) 358-9900
Facsimile: (305) 789-9302

By: _____
Robert T. Wright, Jr., Esq.
Fla. Bar No. 185525
rwright@stroock.com
Irene Oria, Esq.
Fla. Bar. No. 484570
ioria@stroock.com

---

[20]    There is no dispute between the parties that they are in need of a declaratory judgment that declares their rights under the Lease pursuant to 28 U.S.C. §§ 2201 and 2202.

[21]    In Count I of its Complaint, Group USA also demands its reasonable attorney's fees and costs of suit pursuant to the attorney's fees provision contained in Section 29 of the Lease. Group USA reserves the right to file a separate motion directed to its attorney's fees claim after the Court resolves the parties' claims for declaratory relief.

20

Case No. 10-22862-CIV-KING
Case No. 10-22854-CIV-KING

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 29, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

Irene Oria, Esq.
Stroock & Stroock & Lavan LLP

21

STROOCK & STROOCK & LAVAN LLP • MIAMI • NEW YORK • LOS ANGELES
WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BLVD., SUITE 3100 MIAMI, FL 33131
TEL 305.358.9900 FAX 305.789.9302 WWW.STROOCK.COM